546 So.2d 188 (1989)
David TOTH[1]
v.
ENSCO ENVIRONMENTAL SERVICES, INC. and Aetna Insurance Company and/or INA (Insurance Company of North America).
No. 87 CA 1301.
Court of Appeal of Louisiana, First Circuit.
May 16, 1989.
Rehearing Denied June 30, 1989.
*189 Kenneth R. Williams, Baton Rouge, for plaintiff-appellant David Toth.
David T. Butler, Baton Rouge, for defendant-appellee INA/Aetna Ins. Co.
Before WATKINS, CARTER, LANIER, ALFORD and LeBLANC, JJ.
CARTER, Judge.
This is an appeal from a trial court judgment rejecting plaintiff's claim for worker's compensation benefits.

FACTS
On June 21, 1985, while in the course and scope of his employment with Ensco Environmental Services, Inc. (Ensco), plaintiff, David Toth, was shot in the lower abdomen by an unknown sniper. As a result of the accident, plaintiff was unable to work from June 21, 1985, until July 15, 1985. During this time, Ensco's worker's compensation insurer, Aetna Insurance Company/Insurance Company of North America (Aetna), paid compensation benefits covering the initial period of disability[2] and $6,488.98 in medical and surgical expenses.
Thereafter, plaintiff returned to work for Ensco from July 15, 1985, through November 17, 1985. Between November, 1985, and late April, 1986, plaintiff occasionally worked for Ensco at its warehouse in the Baton Rouge area, although he was idle much of the time due to a lack of work. Plaintiff was last employed with Ensco on April 30, 1986.
Approximately two months after he was shot, plaintiff began experiencing episodic pain and numbness in his right leg and groin, which gradually intensified. On September 5, 1986, plaintiff filed a petition for worker's compensation benefits, contending that he was unable to work because of the residual pain and numbness caused by the gunshot wound.
After trial, the court determined that, although there was some disability, the evidence did not conclusively show that plaintiff's disability was a result of his work-related injury and dismissed plaintiff's suit.[3] *190 Plaintiff then filed a motion for new trial, or alternatively, for an amendment to the judgment.[4] After these motions were denied, plaintiff perfected the instant appeal. Plaintiff subsequently filed, in the appellate court, a motion to remand for additional evidence, alleging that, since plaintiff had undergone certain tests he had previously refused to undergo, the case should be remanded for the admission of such evidence. By order dated November 18, 1988, this court referred the motion to remand to the merits.
In his appeal, plaintiff assigns the following specifications of error:[5]
1. The trial court erred in holding that plaintiff failed to establish that the on-the-job injury i.e., the shooting, was a legal cause of his disability.
2. The trial court erred in requiring plaintiff to bear too strict a burden of proof on the issue of causation.
3. The trial court erred in failing under the peculiar circumstances of this case to apply the "reasonable possibility" test in determining whether plaintiff proved causation.
4. The trial court erred in attaching undue significance to the testimony of Dr. Richard Gold, an evaluating physician, and in disregarding the testimony of other doctors, including, Dr. James Robertson, the treating physician.
5. The trial court gave undue weight to plaintiff's alleged refusal to submit to the additional neurological testing suggested by Dr. Gold.
6. The court erroneously concluded that plaintiff refused to submit to the additional neurological tests and unduly penalized plaintiff because the tests were not performed.
7. The trial court erred in ignoring the fundamental principle that the workmen's compensation act is to be construed in the spirit of liberality and in favor of granting recovery to the employee especially in close cases.
8. The court erred in denying plaintiff's motion for a new trial and/or refusing to amend its judgment to provide that it would reconsider the causation issue if plaintiff were to submit to the additional neurological tests.
The central issue in this case is whether the gunshot wound plaintiff received on June 21, 1985, while in the course and scope of his employment with Ensco, caused him to be disabled from April 30, 1986, when he last worked until his death on February 4, 1988.

LEGAL PRECEPTS
The claimant in a worker's compensation proceeding has the burden of establishing his disability and its causal relation with the employment accident by a preponderance of the evidence. Walton v. Normandy Village Homes Association, Inc., 475 So.2d 320 (La.1985); Lucas v. Insurance Company of North America, 342 So.2d 591 (La.1977); Prim v. City of Shreveport, 297 So.2d 421 (La.1974); Pelous v. Guidry, 520 So.2d 1042 (La.App. 3rd Cir.1987), writ denied, 522 So.2d 565 (La.1988). Proof by a preponderance of evidence is sufficient when the evidence, taken as a whole, shows that the fact sought to be proved is more probable than not. Schouest v. J. Ray McDermott & Co., Inc., 411 So.2d 1042 (La.1982); Scott v. Acadian Concrete Co., Inc., 516 So.2d 446 (La.App. 1st Cir.1987), writ denied, 520 So.2d 751 (La.1988).
In order for the claimant to recover worker's compensation benefits, it must be determined that the employment somehow caused or contributed to the disability, but it is not necessary that the exact cause be found. Walton v. Normandy Village Homes Association, Inc., supra; Lucas v. Insurance Company of North America, supra. A claimant's disability is presumed *191 to have resulted from an accident if before the accident the claimant was in good health, but commencing with the accident the symptoms of the disabling condition appeared and continuously manifested themselves afterwards, provided either that there is sufficient medical evidence to show a reasonable possibility of causal connection between the accident and the disabling condition, Allor v. Belden Corporation, 393 So.2d 1233 (La.1981); Lucas v. Insurance Company of North America, supra, or that the nature of the accident, when combined with the other facts of the case, raises a natural inference through human experience of such a causal connection. Walton v. Normandy Village Homes Association, Inc., supra; Hammond v. Fidelity & Casualty Company of New York, 419 So.2d 829 (La.1982); Haughton v. Fireman's Fund American Ins. Companies, 355 So.2d 927 (La.1978). Cf. Thomas v. U.S. Cas. Co., 218 Ga. 493, 128 S.E.2d 749 (1962).
A worker's preexisting condition does not bar his recovery under the Louisiana Worker's Compensation statute. An employer takes the worker as he finds him. An abnormally susceptible worker is entitled to no less protection under the compensation statute than a healthy worker. It is immaterial that the diseased or weakened condition eventually might have produced the disability outside the employment situation. Guillory v. United States Fidelity & Guaranty Insurance Company, 420 So.2d 119 (La.1982); Tucker v. Associated Grocers, Inc., 473 So.2d 328 (La.App. 1st Cir. 1985), writ denied, 477 So.2d 716 (La.1985). In other words, a preexisting disease or infirmity of the employee does not disqualify a claim, if the work-related injury aggravated, accelerated, or combined with the disease or infirmity to produce death or disability for which compensation is claimed. Lucas v. Insurance Company of North America, supra; Johnson v. Travelers Insurance Co., 284 So.2d 888 (La. 1973); Larson, Workmen's Compensation Law, § 12.21, p. 3-336.
When an employee proves that before the accident he had not manifested disabling symptoms, but that commencing with the accident the disabling symptoms appeared and manifested themselves thereafter, and that there is either medical or circumstantial evidence indicating a reasonable possibility of a causal connection between the accident and the activation of the disabling condition, the employee's work-related injury is presumed to have aggravated, accelerated, or combined with his preexisting disease or infirmity to produce his disability. Walton v. Normandy Village Homes Association, Inc., supra; Hammond v. Fidelity & Casualty Company of New York, supra; Haughton v. Fireman's Fund American Ins. Companies, supra; Sarah Simpson v. Caddo Parish School Board, 540 So.2d 997 (La. App. 2nd Cir.1989).
Once the disabled employee establishes the presumption of a causal relationship, the party denying the existence of the presumed fact assumes both the burden of producing evidence and the burden of persuasion on the issue. Walton v. Normandy Village Homes Association, Inc., supra. The presumption of causation is not irrebuttable, rather when established, its effect is to shift the burden of proof to the defendant. Robertson v. Scanio Produce & Institutional Foods, Inc., 449 So.2d 459 (La.1984); Haughton v. Fireman's Fund American Ins. Companies, supra. In other words, in order for the party denying the existence of the presumed causal relationship to prevail, he must produce evidence and persuade the trier of fact that it is more probable than not that the work-related injury did not accelerate, aggravate, or combine with the preexisting disease or infirmity to produce the employee's disability. Walton v. Normandy Village Homes Association, Inc., supra.
In Walton v. Normandy Village Homes Association, Inc., supra, the Supreme Court stated:
The effect of the presumption is not so slight and evanescent that it is spent and disappears upon the mere production of evidence by the adversary. It is a true presumption which has been created for policy reasons that are similar to and just as strong as those that underlie the compensation principle itself: the probability of the causal connection under the circumstances which give rise to the presumption, the difficulty of proving causation with testimony by medical experts often sharply divided by differing schools of opinion, and the desirability of reducing the margin of error inherent in litigation as to a disabled employee, both because he has at stake an interest of transcending valuehis and his family's livelihood -and because those persons who enjoy the product of a business should ultimately bear the cost of injuries *192 or deaths that are incident to the manufacture, preparation, and distribution of the product.... Cf. Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). [475 So.2d at 325]
In reviewing the trial court's judgment, the appellate court must give great weight to the trier of fact's factual conclusions, and reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed even though the appellate court may feel that its own evaluations and inferences are as reasonable. Cadiere v. West Gibson Products Company, Inc., 364 So.2d 998 (La.1978); DeGruy v. Pala, Inc., 525 So.2d 1124 (La. App. 1st Cir.1988), writ denied, 530 So.2d 568 (La.1988); Tucker v. Associated Grocers, Inc., supra. However, this principle does not require the appellate court to affirm the trier of fact's refusal to accept as credible uncontradicted testimony, Johnson v. Travelers Insurance Co., supra, or greatly preponderant objectively-corroborated testimony, Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), where the record indicates no sound reason for its rejection and where the factual finding itself has been reached by overlooking applicable legal principles. West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979); DeGruy v. Pala, Inc., supra; Tucker v. Associated Grocers, Inc., supra. See also Mart v. Hill, 505 So.2d 1120 (La.1987).
In the instant case, we are compelled to reverse the trial court's finding that plaintiff failed to prove by a preponderance of the evidence that his disability was caused by the work-related injury. We find that certain legal principles applicable to the instant case were overlooked or incorrectly applied by the trial court in reaching this determination and that the record reflects no sound reason for rejecting plaintiff's corroborated testimony. The reasons for judgment clearly reflect that the trial court failed to consider the presumption applicable when an injured person is in good health prior to the accident and the symptoms of the disabling condition commence at the time of the accident and continuously manifest themselves and medical evidence shows there is a reasonable possibility of causal connection between the accident and the disability. The reasons for judgment also reflect that the trial court applied the clear and convincing rather than the preponderance of evidence burden of proof.[6] Therefore, this court is not bound by the manifest error rule.

PLAINTIFF'S EVIDENCE ESTABLISHING PRESUMPTION OF CAUSATION
Generally, a causal relationship between a work-related injury and the plaintiff's disability is presumed to exist when the plaintiff proves by medical testimony that there is a reasonable possibility that his disability was due to his work-related injury. Application of the "reasonable possibility" test for causal relationship is proper when it can be shown that the plaintiff was in good health before the accident and that after the accident a preexisting illness or an old injury disconnected with the accident flared up. Thus, in order to have a viable setting for the implementation of the "reasonable possibility" test, two conditions must be met: (1) good health prior to the accident, and (2) medical testimony showing a reasonable possibility that the accident caused the disability. Hull v. North American Van Lines, 343 So.2d 216 (La.App. 1st Cir.1977); Terry Wisner v. Illinois Central Gulf Railroad, et al, 537 So.2d 740 (La.App. 1st Cir.1988).
1. Good Health Before/Disabling Symptoms After
Plaintiff testified that at the time he was shot, he was 41 years old. He had a 10th grade education and had been honorably discharged from the Air Force. He was a master mechanic and could operate heavy machinery such as bulldozers and backhoes. *193 Prior to the shooting incident, plaintiff engaged in steady employment and reported no health problems with his leg, groin, back, or any other area of his body.
Plaintiff had also been a volunteer fireman for six years and was a scout master. Prior to the accident, plaintiff did a lot of camping, hiking, and canoeing with his troop. Plaintiff testified he was always an "outdoor person." He enjoyed working in his garden, cutting the grass, and performing other yard work. He especially enjoyed activities with his boy scout troop.
Plaintiff testified that, since the shooting incident, he had not been symptom free. He testified that when he was shot he felt numbness in his leg and experienced pain in his groin. Despite the pain in his right leg and abdomen, he was able to return to work on lighter duty at the same job from July to November of 1985. Plaintiff had given medical history, consistent with his trial testimony, that the problems with the pain and numbness in his groin and leg began shortly after the shooting incident. These problems increased during the spring of 1986, when he commenced long distance driving for Ensco. He stated that he suffered numbness in his right leg to such an extent that he could not drive very far without stopping to rest his leg and that he occasionally experienced weakness in his leg. At the time of trial, plaintiff complained of pain in his right groin and pain and numbness in his right thigh. Plaintiff described the pain as unbearable. Plaintiff was limping noticeably and had been limping since midsummer of 1986. Plaintiff testified he had been unable to work for Ensco since April 30, 1986, because his condition had gradually worsened.
Additionally, after the accident, plaintiff could no longer go camping, hiking, or canoeing. He could not perform his firefighter duties and experienced difficulty sitting, walking, climbing stairs, and sleeping.
This testimony was corroborated by the testimony of plaintiff's wife and son. Plaintiff's wife testified that before the accident her husband was very active. She stated "you couldn't keep up with him." Plaintiff and his wife often hunted and fished together. After the shooting incident, plaintiff's wife found that plaintiff could no longer fish or hunt. His attitude toward family members changed; he was very irritable. His inactivity and pain often caused him to become depressed and angry.
Plaintiff's son testified that prior to the accident, he and his father rode bicycles and went for walks together. Their activities also included jogging, camping, and hiking. His father never complained of pain and discomfort prior to the accident. Plaintiff's son testified that after the accident his father could not cycle, camp, jog, or hike. His father also began limping noticeably.
The evidence presented at trial clearly shows that, prior to the work-related injury, plaintiff was in good health and that, shortly after the work-related injury, the symptoms appeared and continuously manifested themselves.
2. Medical Evidence Showing a Reasonable Possibility of Causation
The trial record contains medical records and medical testimony, most of which consisted of the stipulated deposition testimony of the physicians who examined and/or treated plaintiff.
Dr. Howard Martin was accepted at trial as an expert in the field of General Surgery. Dr. Martin saw plaintiff on two occasions, namely May 14, 1986, and July 17, 1986. On May 14, 1986, plaintiff complained of episodic pain and loss of sensation and weakness in his right leg. According to the history given by plaintiff, he had been asymptomatic until a sniper shot him, and several months later the symptoms began and became progressively worse. Plaintiff also reported that his symptoms increased with exertion and fatigue.
Dr. Martin's physical findings revealed diminished sensation in the right thigh, which he attributed to possible damage to the lateral cutaneous nerve, which was in the path of the bullet. However, Dr. Martin opined that this possible injury to the lateral cutaneous nerve could not have caused the weakness in plaintiff's leg because the nerve is sensory rather than motor in nature.
Dr. Martin performed x-rays, which showed that the bullet entered plaintiff's abdomen, traversed muscle tissue, and lodged near the pelvis. The x-rays also revealed a congenital spinal defect, called spondylolisthesis. Dr. Martin determined that the spinal defect was only first degree spondylolisthesis, which would not have produced the symptoms of which plaintiff complained.
Dr. Martin was unable to make any final conclusions on these preliminary exams *194 and recommended complete neurological evaluation before surgery to remove the bullet. He then referred plaintiff to Dr. Richard Gold, a neurologist, for further evaluation.
Dr. Gold first examined plaintiff on May 22, 1986. Plaintiff's history revealed that he had sustained a gunshot wound to the abdomen. Thereafter, plaintiff progressively developed pain in the right groin and testicle and episodic loss of sensation and weakness in the right leg.
Dr. Gold's physical examination was normal, except for a notable difference in the measurement of plaintiff's right thigh, hypersensitivity on the anterior aspect of the right leg from the groin to the toe, and a loss of sensation in the right leg. Dr. Gold initially diagnosed involvement of the L4 or a right lumbosacral plexus lesion. Dr. Gold opined that, while he was uncertain as to whether the bullet caused the problems plaintiff was experiencing, plaintiff's complaints were most probably due to the damage caused by the bullet as it travelled through the abdomen.
Dr. Gold also performed numerous diagnostic tests on plaintiff. The EMG performed on June 16, 1986, revealed a possible pinched nerve at L5 and evidence of a pinched femoral cutaneous nerve in the lateral thigh. The CT scan performed on June 18, 1986, showed significant degenerative disease at L3-4 and L4-5, namely spinal stenosis and spondylolisthesis. On June 30 and July 28, 1986, Dr. Gold attempted to perform nerve blocks, which plaintiff refused to undergo.
Dr. Gold stated that he was unable to detect the exact cause of plaintiff's problems. Dr. Gold opined that the pain in the back of plaintiff's leg was attributable to the degenerative disc disease. Dr. Gold stated that he could not determine whether the bullet caused the pain and decreased sensation and numbness in plaintiff's leg and groin without additional testing. However, Dr. Gold determined that the groin pain and the problems plaintiff was experiencing in the front and side of his leg were inconsistent with the degenerative disc disease and were possibly the result of the gunshot wound. Dr. Gold also determined that nerve damage could have caused plaintiff's right thigh to shrink.
Dr. Gold testified that he could not determine whether plaintiff was disabled, but, assuming plaintiff's explanation of his symptoms and the development of those symptoms was correct, it was possible that the shooting caused plaintiff's problems. Dr. Gold believed it was possible for the shooting to also have caused the possible pinched nerve in the lateral thigh. Assuming plaintiff's history was truthful, Dr. Gold opined that the shooting was related, directly or indirectly, to plaintiff's condition.
Aetna referred plaintiff to Dr. James Robertson, a neurologist, who treated plaintiff from October 20 to December 18, 1986. Plaintiff's history revealed that he had received a gunshot wound to the lower right abdomen. The bullet had not caused damage to any major organ and had not been surgically removed. Plaintiff reported experiencing difficulties with his lower right extremity. Although the symptoms appeared shortly after the initial surgery, they did not intensify until some two months after the shooting incident. Plaintiff complained of pain in his right groin and pain and numbness radiating into his lower right extremity, as well as episodic weakness in his right leg. These symptoms reportedly were more pronounced when plaintiff drove long distances or sat in an awkward position.
Dr. Robertson's physical examination of plaintiff revealed decreased flexion and extension of the right leg, which was secondary to pain. Dr. Robertson also noted tenderness to palpation and subjective numbness in the lower right extremity.
Dr. Robertson opined that the onset of problems two months after the shooting incident was probably due to scarring within the pelvis and abdomen, which gradually intensified because of periodic compression of the nerves and decreased blood flow. Dr. Robertson stated that the damage caused by the track of the bullet would explain the numbness and pain plaintiff experienced in the right lateral thigh, groin, and testicle, but would not explain the lumbosacral plexus to the entire leg. Dr. Robertson further stated that plaintiff's lower extremity and groin problems were not the result of his degenerative disc disease.
Dr. Robertson examined plaintiff again on March 13 and April 20, 1987. On those occasions, plaintiff complained of continued pain in the right groin and numbness in the lateral aspect of the right thigh. Plaintiff also complained of limping. Again, Dr. Robertson determined that the groin pain and numbness in the lateral thigh was consistent with the gunshot wound, but could *195 not explain all of the lower extremity problems.
Dr. Robertson recommended that plaintiff avoid performing any activities which caused him pain, including long distance driving, walking, climbing, operating machinery, lifting, and bending. Dr. Robertson prescribed no course of treatment for plaintiff, except medication, and referred plaintiff to Dr. Allen S. Joseph, a neurosurgeon, for surgical intervention.
Dr. Joseph examined plaintiff on December 18, 1986. Plaintiff's history revealed a gunshot wound to the abdomen and persistent problems with episodic pain in the right leg and groin and numbness in the right foot. Dr. Joseph performed routine tests on plaintiff to determine the neurological function in the lower extremities. The test results were normal, except for an altered appreciation on pinstick around the groin.
Dr. Joseph determined that there were two possible causes of plaintiff's pain, namely, the degenerative disc disease and the damage caused by the bullet as it passed near or through the nerve which provides sensation to the groin. Dr. Joseph acknowledged that while the disc disease could cause the weakness in the right leg and the numbness in the right foot, the disc disease would not be related to the groin pain. Additionally, Dr. Joseph opined that plaintiff may not have noticed the numbness in the groin initially because of the pain following surgery, but may have become more aware of the pain and numbness a couple of months later. Further, given the path of the bullet, Dr. Joseph determined that it was more probable than not that the nerve which runs through the groin area was damaged as a result of the gunshot wound.
After carefully reviewing all of the testimony and applying the proper legal principles, we find that plaintiff established, by a preponderance of the evidence, that he was in good health immediately before the accident, but that, after the accident, disabling symptoms appeared and continuously manifested themselves, and the medical evidence revealed a reasonable possibility of a causal connection between the accident and the activation of the disabling condition. Therefore, plaintiff's work-related injury is presumed to have aggravated, accelerated, or combined with his preexisting disease to produce his current disability.

AETNA'S REBUTTAL EVIDENCE
Once plaintiff established this presumption of a causal relationship, the burden of proof shifted to Aetna to produce evidence and to persuade the trier of fact that it is more probable than not that the work-related injury did not cause plaintiff's disability.
The deposition medical testimony was introduced into evidence by stipulation in lieu of the physicians' testimony. Aetna produced no medical evidence in its rebuttal. The only testimony introduced by Aetna was that of Charles Callicott, general manager of Ensco. Callicott testified as to the dates that plaintiff worked for Ensco and the dates of layoff periods.
Callicott also testified as to the nature of the work plaintiff performed for Ensco. He testified that, except for the light duty restriction immediately after the accident, plaintiff was fully able to perform all of the work required of him. However, Callicott testified that, except for the job performed at the accident site, he never personally observed plaintiff at work.
Additionally, Callicott testified that plaintiff was terminated for not reporting for work. Callicott testified that plaintiff indicated he missed work because he felt he was not able to perform the work required due to problems with his leg. Further, Callicott testified that plaintiff's work required a lot of walking and long hours. Callicott also testified that plaintiff was a conscientious employee.
After carefully reviewing the evidence, we find that Aetna failed to carry its burden of proving that it is more probable than not that the work-related injury did not cause plaintiff's disability. Accordingly, we find that plaintiff's work-related accident caused, accelerated, aggravated, and/or combined with his preexisting Class 1 spondylolisthesis to produce his disability.

EXTENT OF DISABILITY
We conclude that plaintiff established a prima facie case of temporary total disability and is entitled to temporary total disability benefits from April 30, 1986, to date of death, February 4, 1988.

CONCLUSION
For the above reasons, the trial judgment in favor of Aetna, dismissing plaintiff's suit for worker's compensation benefits is reversed. Judgment is rendered in favor of plaintiff, awarding him temporary total disability benefits of $248.00 per *196 weeks from April 30, 1986, through February 4, 1988.[7] Plaintiff is also awarded $65.87 in medical benefits and $207.06 in travel expenses. Aetna is cast for all costs.
REVERSED AND RENDERED.
LANIER, J., concurs in part and dissents in part. I agree with the majority on the causation issue but would remand for an evidentiary hearing on the extent of disability.
LeBLANC, J., dissents feeling that plaintiffs have not carried burden of proof.
LANIER, J., concurring in the denial of the rehearing.
On original hearing, the majority refused to award interest on the award in favor of the plaintiffs because it was not prayed for in the petition. The plaintiffs have requested a rehearing asking that we award legal interest on the compensation benefit payments from the due date of each installment until paid, citing as authority La.C. C.P. arts. 862 and 1921 and Mini Togs Products, Inc. v. Wallace, 513 So.2d 867 (La.App. 2nd Cir.), writ denied, 515 So.2d 451 (La.1987).
La.C.C.P. art. 1921 provides as follows:
The court shall award interest in the judgment as prayed for or as provided by law.
Official revisions comments (a) and (c) for Article 1921 provide as follows:
(a) This article retains the requirement of Art. 553, Code of Practice of 1870, to the effect that interest may be awarded by the judgment only if prayed for.

The phrase "as provided by law" will cover the exception in the case of tort claims, since in these cases interest attaches automatically, without being prayed for.
. . . .
(c) The problem of when the running of interest begins is integrally bound up with substantive law, and for this reason should not be included in this project. The phrase "as provided by law" refers to the articles of the Civil Code and to R.S. 13:4203 and the considerable jurisprudence under these provisions.
[Emphasis added.]
Prior to the enactment of Article 1921 in 1960, La.C.C.P. art. 553 (1870), and the jurisprudence interpreting it, provided that interest could not be awarded unless it was "expressly claimed" in the petition. In Cerniglia v. City of New Orleans, 234 La. 730, 101 So.2d 218, 221-222 (1958), appears the following:
In their application for a rehearing the appellees herein complained that we erred in failing to allow interest at the legal rate from date of judicial demand and further that we failed to consider the payment of costs other than experts' fees.
In their answer to the appeal appellees prayed that the judgment be amended "by increasing the amount allowed therein for damages to $14,500 and awarding legal interest from date of judicial demand until paid and all costs and affirming the sum of $450 allowed for experts' fees." However, it was and is significantly observed that in their petition plaintiffs failed to expressly claim legal interest from the date of judicial demand. The said prayer of their petition was for judgment in the amount sued for, for the fixing of reasonable fees for the experts testifying on their behalf, for the taxing and assessing of said fees as cost, and for all cost.
Article 553 of the Code of Practice provides: "Interest shall not be allowed by the judgment, unless the same have been expressly claimed, and then only in cases in which the law permits such interests to be stipulated."
Manifestly, having failed to expressly claim any interest due as required by Code of Practice, Article 553 of the judgment of the lower court could not have allowed the same and our affirmance of the judgment rendered below is in full compliance with our law.
[Emphasis added.]
See also Troquille v. Lacaze's Estate, 222 La. 611, 63 So.2d 139 (1953). La.C.C.P. art. 1921 should be, and has been, interpreted the same as La.C.C.P. art. 553 (1870). Succession of Mulqueeny, 253 La. 595, 218 So.2d 607 (1969); Succession of Dittmar, 493 So.2d 221 (La.App. 5th Cir.1986); Anthony v. New Orleans Public Service, Inc., 480 So.2d 440 (La.App. 4th Cir.1985), writ denied, 482 So.2d 628 (La.1986); Shell Pipe Line Corporation v. Sarver, 442 So.2d 884 (La.App. 3rd Cir.1983), writ denied, 446 So.2d 319 (La.1984). Cf. ODECO Oil & Gas Company v. Nunez, 532 So.2d 453, 465 n. 5 (La.App. 1st Cir.1988), writ denied, *197 535 So.2d 745 (La.1989); Landry v. Louisiana Hospital Service, Inc., 449 So.2d 584 (La.App. 1st Cir.1984); Aetna Finance Company of Baton Rouge v. Perkins, 448 So.2d 121, 128 n. 4 (La.App. 1st Cir.1984). The holding in Mini Togs is contrary to this jurisprudence and should not be followed.
La.C.C.P. art. 862 is not controlling. It pertains generally to the relief that can be granted in a final judgment and provides as follows:
Except as provided in Article 1703, a final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings and the latter contain no prayer for general and equitable relief.
La.C.C.P. art. 1921 is a specific provision pertaining to the awarding of interest in a final judgment. It is a well established principle of statutory interpretation that when two statutes are applicable to the same situation, the one more specifically directed to the matter at issue must prevail as an exception to the more general statute. Lyman v. Town of Sunset, 500 So.2d 390 (La.1987). If Article 862 is interpreted as controlling, Article 1921 would be rendered meaningless. It is also a well established principle of statutory interpretation that statutes on the same subject matter should not be construed in such a way which renders one nugatory. Bunch v. Town of St. Francisville, 446 So.2d 1357 (La.App. 1st Cir.1984).
NOTES
[1] David Toth died on February 4, 1988, and the cause of his death is unknown. Thereafter, the appropriate parties-plaintiffs were substituted. For purposes of clarity, the opinion refers to Toth as plaintiff.
[2] According to stipulations, plaintiff's applicable worker's compensation rate was $248.00 per week based on an average weekly wage of $700.00.
[3] In his oral reasons for judgment, the trial judge stated:

I will say that based on the evidence I've heard, I think that Mr. Toth has not proven his claim as required by law and would order that his petition be dismissed at his costs. I will say, however, that because this evidence was not available to him at the time of this trial and because I did not know nor did you know that I was going to say these things, it now may become more incumbent upon him to reaccess (sic) his position. And if he finds that he can submit to the tests and those tests establish one way or the other certain evidence which was unavailable for presentation at the time of the trial, Mr. Toth can file a motion for new trial, if it is evidence in his favor.
The evidence to which the trial judge referred was a diagnostic nerve block.
[4] The motion filed by plaintiff requested reconsideration of the issue of causation because the judgment on this issue was contrary to the law and the evidence. Plaintiff, alternatively, requested that the judgment dated May 29, 1987, be amended to reflect the proviso that plaintiff could apply for a new trial if he underwent the diagnostic nerve block.
[5] Although the opinion does not specifically address each assignment of error, the opinion effectively addresses all issues raised.
[6] The trial court found that plaintiff's testimony was very acceptable and believable and that there was some initial disability caused by the gunshot wound. Additionally, the court found there was no question that plaintiff suffered some disability. However, the trial court was uncertain as to whether that disability was related to the gunshot wound. The trial judge stated, in his oral reasons for judgment:

There are two things that are important legally. One is that he has a standard of proving not only by preponderance of the evidence but by clear and convincing evidence. But even if it were a standard of by preponderance of the evidence, I'm not satisfied that he has proven his claim by preponderance.
The trial court went on to state that there is a statutory presumption that evidence which is under the control of a party and which is not produced by the party would not have aided him. The trial judge concluded that, since plaintiff refused the nerve block test recommended, the evidence provided by the test would not have aided plaintiff.
[7] Legal interest has not been awarded because it was not prayed for.